UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICKEY D. WILLIS,

                Plaintiff,                            Civil Action No. 12-cv-10011

      v.                                 District Judge Robert H. Cleland
                                            Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT [10] AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

Plaintiff Rickey Willis appeals the denial of his application for Disability Insurance Benefits. Before the Court for a report and recommendation (ECF No. 3) are the parties' cross-motions for summary judgment (ECF Nos. 10, 14). Plaintiff asserts that the disability decision must be reversed primarily because the Administrative Law Judge did not comply with the treating-source rule. (ECF No. 10, Pl.'s Mot. Summ. J. at 7-14.) Defendant Commissioner of Social Security ("Commissioner") urges the Court to affirm his decision because the ALJ provided "good reasons" for how he weighed the opinion evidence. (ECF No. 14, Def.'s Mot. Summ. J. at 6-13.) For the reasons set forth below, this Court finds that the opinions Plaintiff relies upon were authored by examining, rather than treating, sources and Plaintiff's other claims of error also do not warrant remand. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be

AFFIRMED.

## I.  BACKGROUND

Willis has a high-school education.  (Tr. 61.)  For about 15 years Plaintiff worked for an automotive parts manufacturer; he first built parts, and later he was promoted to supplying raw materials for parts and delivering assembled parts.  (Tr. 61, 65.)  In March 2007, at age 41, Plaintiff injured his back at work when he and another worker were carrying 100-pounds of tubular steel. (*See* Tr. 65-66.)

### A.  Procedural History

On October 8, 2007, Plaintiff applied for Disability Insurance Benefits ("DIB") asserting that he became unable to work on March 9, 2007.  (Tr. 16.)  The Commissioner initially denied Plaintiff's disability application on March 28, 2008.  (*Id.*)  Plaintiff then requested an administrative hearing, and on July 1, 2010, he appeared with counsel before Administrative Law Judge John Murdock, who considered his case *de novo*.  (Tr. 55-95.)  In a September 17, 2010 decision, ALJ Murdock found that Plaintiff was not disabled.  (*See* Tr. 16-26.)  His decision became the final decision of the Commissioner on November 9, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on January 3, 2012.  (ECF No. 1, Compl.)

### B.  Medical Evidence

In March 2007, Willis slipped and "jerked his back" while carrying a heavy, steel rack at work.  (Tr. 330, 600.)  Plaintiff's pain increased in the days that followed, including discomfort while sitting and standing, difficulty sleeping at night, and pain that radiated down primarily his left leg.  (Tr. 330.)  On March 22, 2007, Plaintiff went to the emergency room because he had been

experiencing five-out-of-ten back pain for two weeks. (Tr. 523, 527.) A CT scan showed degenerative disc disease at L5-S1, "degenerative neuro 'trauma/foraminal compromise at L5[-]S1 on the right side,'" and mild bulging of the L4-L5 disc. (Tr. 330.)

Plaintiff saw Dr. Carol van der Harst three times for back pain in the spring of 2007. (Tr. 328-31.) In April 2007, Dr. van der Harst diagnosed "[b]ack pain with trivial event onset, increasing pain and disability now with clear picture of radicular weakness and pain." (Tr. 331.) She kept Plaintiff off work and prescribed pain medications such as Vicodin. (*Id.*) An April 2007 MRI ordered by Dr. van der Harst revealed a "[s]mall central disc herniation at L5-S1 resulting in mild compression of the anterior thecal sac" and "a small central annular tear at L4-5." (Tr. 342.) In May 2007, Dr. van der Harst performed an EMG which revealed no evidence of lumbar radiculopathy. (Tr. 338.) That month, Dr. van der Harst indicated that she would taper medications and that Plaintiff would "return to work without restrictions." (Tr. 329.) Two weeks later, Dr. van der Harst examined Plaintiff and found that while he still had spinal tenderness, he could do ten pushups and ambulate normally. (Tr. 328.) She cleared Willis to return to work. (*Id.*)

In June 2007, Plaintiff reported to his physical therapist that his right leg had given out when he was rushing to answer the phone. (Tr. 359.) In August 2007, however, Plaintiff reported that he was feeling good and denied back pain. (Tr. 364.) At discharge from physical therapy, the therapist noted, "[zero] pain/discomfort in low back." (Tr. 364.)

Willis' temporary pain relief may have been due to contemporaneous treatment at Michigan Spine & Pain ("MSP"). (*See* Tr. 477-87, 491-505.) On August 16, 2007, Dr. Herman Ruiz at MSP gave Plaintiff a third epidural steroid injection and noted, "[t]he last injection continues to help patient. Patient is able to do almost everything better." (Tr. 494.)

3

On September 12, 2007, Michael Barrett, a chiropractic doctor and certified functional capacity evaluator at MSP, evaluated Plaintiff and provided a functional assessment. (Tr. 869-71.) Barrett noted that Willis "gave reliable efforts" during testing and found that Plaintiff had the ability to "occasionally" (i.e., one-third of an eight-hour workday) lift weights from 5-30 pounds depending on the type of lifting (e.g., he could only lift five pounds overhead). (Tr. 869.) Barrett also found that Plaintiff could do each of sitting, standing, and "reach[ing]-out" "occasionally." (Tr. 870.)

On September 28, 2007, Dr. Ruiz at MSP noted that Willis felt worse after the most-recent injection. (Tr. 485.) Plaintiff reported sore hips and left-leg numbness at times. (Tr. 485.) Dr. Ruiz prescribed MS Contin: morphine in a tablet form. (*Id.*) Despite the prescription, Plaintiff went to the emergency room the next day with 10-out-of-10 pain. (Tr. 510.) Plaintiff reported that the MS Contin was insufficient. (Tr. 511.) The emergency-room physician administered Vicodin intravenously. (Tr. 512.)

On October 1, 2007, Willis reported to a physicians assistant at MSP that he had been experiencing aching, stabbing, and throbbing pain at the six-out-of-ten level. (Tr. 578.) About a week later, Plaintiff reported eight-out-of-ten pain. (Tr. 572.) On October 15, 2007, Dr. Ruiz noted that "[t]he injections didn't seem to help [him]. The day after the last injection [he] could[] hardly move. [Mr. Willis] [f]eels like he is back to the way he was before he even started." (Tr. 477.)

In October and November 2007, Plaintiff was also evaluated by Dr. Gerald Schell, a neurologist. (Tr. 763-64.) Dr. Schell suspected, based on MRI findings and a clinical exam which revealed "a lot of lumbrosacral pain, spasm, and an antalgic gait," that Willis' L5-S1 vertebrae, as opposed to L4-L5, was the source of his pain. (Tr. 763.) Dr. Schell noted that his hypothesis would need to be confirmed through a discography. (*Id.*)

4

On March 27, 2008, Dr. Jeffery Forsythe reviewed Plaintiff's medical file for the Social Security Administration and completed a "Residual Functional Capacity Assessment" form. (Tr. 657-64.)[1] He provided that Plaintiff could perform a limited range of "light" work, including that Plaintiff could lift 20 pounds occasionally, 10 frequently, stand or walk for about six hours in an eight-hour workday, and sit for about six hours in a workday. (Tr. 658.) In support of these conclusions Dr. Forsythe cited a July 2007 x-ray, a May 2007 MRI, and a November 2007 off-work request. (Tr. 658-59.)

On April 1, 2008, Plaintiff had two studies performed. (Tr. 627-30.) One, the discogram mentioned by Dr. Schell, attempted to isolate the source of Plaintiff's pain: Plaintiff reported his pain levels before and after Lidocaine injections at different vertebral levels. (*See* Tr. 628.) The procedure, however, revealed that pain at L4-L5 and L5-S1 decreased only minimally after injections. (*Id.*) The test was therefore "considered inconclusive of any particular level of disc disease." (Tr. 628.) The second, a CT scan, revealed "[d]iscogenic narrowing at L5-S1 with a bulging annulus" and "[m]ild lower lumbar facet hypertrophic change with degenerative change at L3-L4 level and with sclerosis of the vertebral endplate of L3." (Tr. 630.)

From January to April 2008, Willis received treatment at the Pinconning Medical Center. (Tr. 745-48.) He had three visits with Physicians Assistant Richard Call and one with P.A. Call and Dr. Jack Wagner. (*See* Tr. 745-48.) After the fourth visit, on April 25, 2008, P.A. Call and Dr.

---

[1]Forsythe did not sign his name as a "M.D." or "D.O." However, he did sign a box designated for "medical consultant[s]" and the regulations provide that "[a] medical consultant must be an acceptable medical source identified in § 404.1513(a)(1) or (a)(3) through (a)(5); that is, a licensed physician (medical or osteopathic), a licensed optometrist, a licensed podiatrist, or a qualified speech-language pathologist." 20 C.F.R. § 404.1616. Further, both parties refer to Forsythe as a doctor. (*See* Pl.'s Mot. Summ. J. at 10; Def.'s Mot. Summ. J. at 11.) The Court therefore does not question Forsythe's status further and will refer to him as a doctor.

Wagner completed a "Medical Assessment of Ability to Do Work-Related Activities" form.  (Tr. 740-42.)  They provided that Plaintiff could "occasionally" (up to one-third of the workday) lift five-to-ten pounds.  (Tr. 740.)  They opined that Plaintiff could stand for two hours in an eight-hour workday but could sit for only four hours in a workday.  (Tr. 741.)  When asked to specify medical findings supporting this assessment, Dr. Wagner and P.A. Call provided, "intractable pain."  (*Id.*) The form also asked if Plaintiff could "sustain any work activity for five days a week, eight hours a day, fifty-two weeks a year."  (Tr. 742.)  Dr. Wagner and P.A. Call responded, "Not at this point. He is still being worked up by neurosurgery.  He has had a [positive] discogram which identified [two or three] problem discs. [T]reatment options are being weighed by neurosurgery [and] the patient."  (*Id.*)

"[N]eurosurgery" was apparently a reference to Dr. Schell (the neurosurgeon who had evaluated Plaintiff in October and November 2007).  (Tr. 762.)  In a May 2008 letter to Dr. Wagner, Dr. Schell stated,

> Mr. Rick Willis was seen today.  He underwent that discography which did not demonstrate there was any one site which would identify the obvious pain generator of the lumbar spine.  He has multiple levels of degenerative changes of the spine and multiple levels of disk change without severe stenosis.[2]  He has had that chronic pain syndrome.  I don't sense that fusion surgery would be of benefit particularly based on the multiple level[s] of involvement in the discogram which was nonlocalizing.  We thought that perhaps we could send him to the pain clinic to see whether or not any further treatments such as a dorsal column simulator might need to be considered at some point in time.

(*Id.*)

---

[2]"Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine."  Mayo Clinic Website, *Spinal Stenosis*, http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited Oct. 7, 2012).

On September 5, 2008, however, Plaintiff underwent an L5-S1 discectomy, decompression, and fusion. (Tr. 775.) At a physical therapy session about two-and-a-half months after surgery, Plaintiff reported that his immediate pain level was four-out-of-ten and that his maximum pain level was six-out-of-ten. (Tr. 792.) The therapist noted that Plaintiff had made progress increasing his trunk range of motion and leg strength and that Plaintiff had not reported his left leg "giving out." (*Id.*) Plaintiff, however, continued to demonstrate left quadriceps weakness, restricted trunk range of motion, and pain limiting his ability to sleep. (Tr. 792.)

From January to March 2009, Willis continued (or restarted) physical therapy. (Tr. 685-99; *see also* Tr. 797-811.) In January 2009, Plaintiff reported that his lower-back pain was five-out-of-ten and that sitting, standing, or bending for an hour aggravated the pain. (Tr. 797.) Plaintiff was then medicating with Ibuprofen and Darvocet. (*Id.*) On March 4, 2009, Plaintiff reported that his pain had diminished to the three-out-of-ten level, and the therapist noted that Plaintiff had been "responding well" to the treatment program. (Tr. 690.)

On March 9, 2009, Dr. Marvin Keeling, a primary-care physician, examined Plaintiff for the second time and found palpable tenderness at L5-S1 with decreased flexion and extension. (Tr. 670, 669; *see also* Tr. 73.) He diagnosed Plaintiff with a herniated nucleus pulposus at L5-S1 and degenerative joint disease of the lumbosacral spine. (*Id.*; *see also* Tr. 954.) Dr. Keeling instructed that Plaintiff continue with physical therapy and prescribed Vicodin and a non-steroidal anti-inflammatory drug. (Tr. 669.) Dr. Keeling also completed a "Medical Examination Report" for Michigan's Department of Human Services. (Tr. 954-55.) He opined that Plaintiff could stand and/or walk for less than two hours in an eight-hour day and sit for less than six hours in an eight-hour day. (Tr. 953.) He also provided that Plaintiff could not repetitively push or pull or operate

7

foot controls.  (*Id.*)

On April 6, 2009, Dr. Keeling provided a second functional assessment of Plaintiff.  (Tr. 829-31.)  He opined that, due to  "significant pain in the lumbosacral spine with standing," Plaintiff could stand or walk for less than two hours in an eight-hour day but could sit for six hours in an eight-hour day.  (Tr. 829-30.)  Regarding lifting, he opined that Plaintiff could carry 10 pounds "frequently" (i.e., up to two-thirds of a workday) and 25 pounds "occasionally" (i.e., up to one-third of a workday).  (*Id.*)  In support of this assessment, Dr. Keeling noted, "physical exam and MRI reports."  (*Id.*)  Dr. Keeling further provided that Plaintiff could "never" climb, balance, stoop, crouch, kneel, or crawl, and that Willis was limited in reaching, handling, and pushing.  (Tr. 830.)

Plaintiff continued to see Dr. Keeling — sometimes for medical conditions unrelated to his back — at least through April 2010.  In May 2009, Plaintiff reported that there was no change in his back condition and Dr. Keeling refilled Plaintiff's Vicodin prescription.  (Tr. 897.)  In July 2009, Plaintiff again reported that his back felt the same and requested a medication refill.  (Tr. 900.)  In October 2009, Plaintiff told Dr. Keeling that he could not remain on oxycodone because his wife feared addiction.  (Tr. 903.)  In April 2010, Plaintiff reported that his back condition remained unchanged; Dr. Keeling prescribed Ultram and continued Vicodin.  (Tr. 906.)

**C.  Testimony at the Hearing Before the ALJ**

*1.  Plaintiff's Testimony*

Willis testified that his back pain, when on medication, was typically at the five-out-of-ten level; he noted that without medication, "I would probably be up to around a nine or [ten]."  (Tr. 77.)  He also explained that after his back injury but before surgery he could lift no more than five pounds, and that, even after surgery, he could only carry 10 or 15 pounds when holding the weight

8

close to his body.  (Tr. 81.)  He testified that both before and after surgery his back limited him to a few minutes of standing in one place.  (Tr. 81-82.)  Plaintiff stated that after his injury he could sit for only about an hour, and, post-surgery, this improved to about two hours.  (Tr. 82.)  Willis told the ALJ that he reclined five or six hours per day.  (*Id.*)

Plaintiff also testified to mental impairments.  (Tr. 70, 74, 78.)  He explained that he was in counseling "mainly to deal with depression [caused by] not being able to do things I should be able to do."  (Tr. 74.)  He continued, "it's extremely depressing to have to ask my 72 year old dad to help me with something . . . or my wife or my daughter, things that I should be able to do."  (*Id.*)  Plaintiff also testified that his pain medication affected his memory and concentration.  (Tr. 70.)  Willis told the ALJ, "I can't focus on anything for . . . more than five minutes.  I get up out of my chair to do something and I forget [what] I was going to do.  You know, my memory is shot."  (Tr. 78.)

When ALJ Murdock asked Plaintiff why he thought he could not work, Plaintiff answered, "everything I do is much slower than I used to do and I've got to take a break and rest every so often.  And a break isn't just like a couple of minutes like it used to be, now it's like 15 or 20, you know.  And I just can't get enough done in a day's time."  (Tr. 85.)

### 2. The Vocational Expert's Testimony

At Plaintiff's administrative hearing, the ALJ asked a vocational expert ("VE") about job availability for a hypothetical individual of Willis' age, education, and work experience who was capable of sedentary work with no "industrial climbing," i.e., ropes, ladders, and scaffolds; only "occasional" "other climbing, balancing, stopping, kneeling, crouching[,] and crawling"; and no exposure to hazardous machinery or heights.  (Tr. 87-88.)  The VE testified that such a person would be capable of sedentary work as an off-line bench assembler, a packager, and an information clerk,

each with over 40,000 jobs available nationally.  (Tr. 88.)

## II.  THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th

10

Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Murdock found that Plaintiff had not engaged in substantial gainful activity since Willis' alleged disability onset date of March 9, 2007. (Tr. 18.) At step two, he found that Plaintiff had the following severe impairment: degenerative disc disease. (*Id.*) Next, the ALJ concluded that this impairment did not meet or medically equal a listed impairment. (Tr. 19-20.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform

> sedentary work as defined in 20 CFR 404.1567(a) except no climbing ladders, ropes and scaffolds, occasional other climbing, balancing, stooping, kneeling, crouching, and crawling, and no exposure to hazards such as machinery and heights.

(Tr. 20.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 24.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Willis' age, education, and work experience, and with Plaintiff's residual functional capacity. (Tr. 25.) The ALJ therefore concluded that Plaintiff was not under a disability, as defined by the Social Security Act, from the alleged onset date through the date of his disability decision, September 17, 2010. (Tr. 26.)

11

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).   Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);  *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party."  (internal

quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by The Courts" (internal quotation marks omitted)).

## IV.  ANALYSIS

Willis appeals the Commissioner's decision on several grounds.  He argues that the ALJ improperly discounted his statements about the severity of his back pain and his functional limitations.  (Pl.'s Mot. Summ. J. at 14-24.)  Plaintiff also claims that the ALJ erred in finding that his depression was not a "severe" impairment.  (*Id.* at 24-25.)  Willis further asserts that the ALJ should have, but did not, account for a workers' compensation settlement.  (*Id.* at 26-27.)  Plaintiff's primary basis for appeal, however, is that the ALJ erred by failing to give controlling weight to the opinions of his treating physicians and, relatedly, that the ALJ failed to give "good reasons" for rejecting the opinions of his treating physicians.  (*Id.* at 7-14.)  The Court begins with this last claim of error.

### A.  Plaintiff Has Not Shown that the ALJ Violated the Treating Source Rule

Plaintiff's treating-source argument is premised on three sets of opinions: (1) Dr. Wagner and P.A. Call's joint opinion, (2) Dr. Keeling's opinions, and (3) Barrett's functional evaluation. Plaintiff, however, acknowledges that Barrett's status as a Doctor of Chiropractic and a certified functional capacity evaluator does not render him an "acceptable medical source" as defined in the

13

Social Security regulations.  (Pl.'s Mot. Summ. J. at 8); 20 C.F.R. §§ 404.1502, 404.1513(a), 404.1513(d)(1) (providing that a chiropractor is an "other source[]").  And only opinions authored by "acceptable medical source[s]" can trigger the treating-source rule.  S.S.R. 06-04p, 2006 WL 2329939, at *2.  In fact, under the regulations, Barrett did not even offer a "medical opinion."  *Id.* ("[O]nly 'acceptable medical sources' can give us medical opinions.").  Accordingly, Barrett's opinion does not support Plaintiff's claim of error.

As for Drs. Wagner and Keeling, both parties appear to assume that they are treating sources.  (*See* Pl.'s Mot. Summ. J. at 7, 12-14; Def.'s Mot. Summ. J. at 7-8, 9-11.)  But this assumption may not be left unchallenged.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("Before determining whether the ALJ violated [*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004)] by failing to properly consider a medical source, we must first classify that source as a 'treating source.'").  As the Sixth Circuit explained in *Smith*, medical opinions come from three types of sources:

> A "nonexamining source" is "a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." [20 C.F.R.] § 404.1502.  A "nontreating source" (but examining source) has examined the claimant "but does not have, or did not have, an ongoing treatment relationship with" her.  *Id.*  A treating source, accorded the most deference by the SSA, has not only examined the claimant but also has an "ongoing treatment relationship" with her consistent with accepted medical practice.  *Id.*

*Smith*, 482 F.3d at 876.

A careful review of the record makes plain that neither the Wagner-Call or Keeling opinions are entitled to treating-source deference.  Beginning with the Wagner-Call opinion, Plaintiff saw Dr. Wagner (as opposed to P.A. Call) only once.  (*See* Tr. 740-42, 745-48.)  One visit does not forge the

14

requisite longitudinal relationship.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship. . . .  Indeed, depending on the circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."); *see also* 20 C.F.R. § 404.1527(c)(2) ("[T]reating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . reports of individual examinations, such as consultative examinations or brief hospitalizations." (emphasis added)).  Further, although Plaintiff saw P.A. Call several times, a physicians assistant is not an "acceptable medical source."  20 C.F.R. § 404.1513(d)(1).  Thus, his contribution to the joint opinion does not result in an opinion entitled to treating-source deference.

As for Dr. Keeling's opinions, they issued after Plaintiff saw Dr. Keeling only two times. (*See* Tr. 73, 670, 669, 954-55.)  Although Dr. Keeling later developed a treating relationship with Willis (*see* Tr. 897-906), at the time he issued his opinions, that longitudinal relationship was not yet established.  So Dr. Keeling's assessments also do not qualify as treating-source opinions.  *See Kornecky*, 167 F. App'x at 506 ("[T]he relevant inquiry is not whether [the examining doctor] might have become a treating physician in the future if [Plaintiff] had visited him again.  The question is whether [the physician] had the ongoing relationship with [Plaintiff] to qualify as a treating physician *at the time he rendered his opinion*.").

Because none of Barrett, Dr. Keeling, nor Dr. Wagner offered treating-source opinions, Plaintiff has not shown that the ALJ erred.  Willis asserts that "the ALJ['s] decision erred in failing to give controlling weight to the opinions of Plaintiff's treating physicians" (Pl.'s Mot. Summ. J. at

7 (capitalization altered)), and that "the ALJ['s] decision erred in failing to provide any good reasons

for rejecting the opinions of Plaintiff's treating physicians," (*id.* at 13  (capitalization altered)).

Plaintiff relies on *Wilson* and other treating-source cases in support of these claims of error.  (*Id.* at

12, 14.)  But only treating-source opinions qualify for controlling weight.  S.S.R. 96-2p, 1996 WL

374188, at *2 ("The rule on controlling weight applies when all of the following are present:  1. The

opinion must come from a 'treating source,' as defined in 20 CFR 404.1502 and 416.902. . . .").  As

for the explanatory aspect of the rule, i.e., the "good reasons" requirement, the Sixth Circuit has

explained:

> [E]ven if the purpose of the reasons-giving requirement in
> § 404.1527(d)(2) applies to the entire regulation, the SSA requires
> ALJs to give reasons for only *treating* sources. . . .  In the absence of
> treating-source status for these doctors, we do not reach the question
> of whether the ALJ violated *Wilson* by failing to give reasons for not
> accepting their reports.

*Smith*, 482 F.3d at 876.  Thus, as in *Smith*, the Court "do[es] not reach the question of whether the

ALJ violated *Wilson* by failing to give reasons for not accepting their reports," 482 F.3d at 876.

Accordingly, Plaintiff's first theory for reversing the ALJ fails as a matter of law.

### B.   Plaintiff Has Not Shown That the ALJ Reversibly Erred in Assessing His Credibility

Willis next asserts that the ALJ erroneously discounted his testimony about the limiting

effects of his pain.  (Pl.'s Mot. Summ. J. at 14-24.)  Willis first directs this Court's attention to the

results of various imaging studies and clinical testing.  For instance, Plaintiff references a January

2008 MRI which revealed an asymmetric osteophyte disc complex producing "distortion of the

exiting L5 nerve root."  (*Id.* at 15 (citing Tr. 758-59).)  Plaintiff cites an April 2008 MRI showing

a small central herniated nucleus pulposus at L5-S1.  (*Id.* at 21 (citing Tr. 767).)  Willis also notes

that during a post-surgery, physical-therapy evaluation, straight-leg raising, quadrant, Ober's, and Patrick's tests were positive.  (*Id.* at 22 (citing Tr. 797, 801).)  After recounting other objective evidence at length, Plaintiff argues that the ALJ's credibility determination — "In terms of the claimant's alleged degenerative disc disease, although the existence of this impairment is documented by the medical evidence of record, the alleged severity is not" (Tr. 23) — "is, in fact, contrary to the medical evidence of record cited above."  (Pl.'s Mot. Summ. J. at 23.)

The Court cannot say that the objective medical evidence cited by Willis shows that the ALJ unreasonably discounted his testimony about the severity of his back pain.  Nothing in the recounted imaging studies and clinical testing makes plain to a lay person that the ALJ's decision to discount Plaintiff's testimony was necessarily unreasonable.  The Court is not in position, and certainly no better position than an ALJ, to interpret the pain or functional limitations associated with, for example, an asymmetric osteophyte disc complex producing "distortion of the exiting L5 nerve root" (Tr. 758-59) and a positive Ober's test (Tr. 797, 801).  Plaintiff has not demonstrated that the ALJ ignored the objective medical evidence he now cites to this Court.  Nor has Plaintiff cited objective medical evidence demonstrating to a lay person that Plaintiff would necessarily suffer the alleged pain.  Absent such a showing, the Court will not disturb the ALJ's credibility assessment based on its own de novo review of the objective medical evidence. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."); *see also Sims v. Comm'r of Soc. Sec*, 406 F. App'x 977, 981 (6th Cir. 2011) ("[T]he district court correctly noted that the ALJ's credibility assessment could be disturbed only for a compelling reason.").

17

Plaintiff additionally raises a related procedural claim of error. Willis says that once the ALJ found that he had a medically determinable impairment reasonably expected to produce the alleged symptoms, *see Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011), he was required to provide "clear and convincing" reasons for rejecting his allegations:

> Where objective medical evidence of an underlying impairment could reasonably be expected to produce pain or other symptoms, an ALJ cannot reject a claimant's testimony about the severity of the symptoms without offering clear and convincing reasons for doing so. *Smolen v. Chafer*, 80 F.3d 1273 (9th Cir. 1996). In the present case, Plaintiff's symptoms are clearly reported in the medical record, are supported by objective medical tests and evaluations, and are not questioned by the treating doctors. The ALJ['s] [d]ecision attempts a lay person assessment of what the severity of Plaintiff's symptoms should be with no support in the medical record, and fails to provide "clear and convincing" reasons for rejecting Plaintiff's testimony regarding the severity of his symptoms.

(Pl.'s Mot. Summ. J. at 23-24.)

Although this Court is not aware of any Sixth Circuit authority couching the explanatory requirement as "clear and convincing," Willis is correct that an ALJ must sufficiently explain his credibility assessment and the explanation must be supported by substantial evidence. In particular, at step two of the two-step framework for analyzing credibility, an ALJ

> must evaluate the intensity, persistence, and functional limitations of those symptoms by considering objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96-7p, 1996 SSR LEXIS 4, at *5-8 (1996).

*Calvin*, 437 F. App'x at 371. The ALJ's "decision must contain specific reasons for the finding on

18

credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186 at *2.

At the hearing before the ALJ, Plaintiff testified that he has five-out-of-ten pain with medication (Tr. 77), that he can focus for only five minutes (Tr. 78), that he could lift only five pounds post-accident, pre-surgery and 10 to 15 pounds post-surgery (when holding the weight close to his body) (Tr. 81), that he could stand or walk for only a few minutes (Tr. 81-82), that, before needing to recline, he could sit for about an hour post-accident, pre-surgery and two hours post-surgery (Tr. 82), and that he could "go" for maybe one to two hours before needing to sit down for about a half-hour (Tr. 85).

To the extent that Plaintiff testified that he can stand for a *total* of just a few minutes during an eight-hour workday, and that he lacks the concentration necessary to engage in unskilled work,[3]

---

[3]It appears that the VE testified to only unskilled positions. (Tr. 88 (noting that all sedentary jobs had a Dictionary of Occupational Titles reasoning level of 2); Tr. 91 (testifying that information clerk position was "unskilled").) In fact, the ALJ acknowledged as much when relying on VE testimony at step five of his disability analysis:

> To determine the extent to which these limitations erode the *unskilled* sedentary occupational base, I asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a bench assembler (41,000 nationally); packager (69,000 nationally); and info clerk (84,000 nationally).

(Tr. 25 (emphasis added).) In any event, the VE identified the information clerk position as unskilled, and 84,000 jobs nationally is sufficient to support the ALJ's conclusion at step five. *See Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (concluding that 1,600 jobs in the state and 80,000 jobs nationally constituted substantial evidence); *Smith v. Soc. Sec. Admin.*, No. 3:10-0145, 2011 WL 795006, at *8 (M.D. Tenn. Mar. 1, 2011) ("Even if the expert's testimony could be read as applying the 40-50% reduction to the 8,000 regional and 200,000 national jobs, the resulting

the ALJ provided adequate explanation for discounting such statements. The ALJ noted that Willis "reports being able to perform tasks, including grocery shopping, playing guitar, and taking care of his dogs." (Tr. 21, 23.) The ALJ referenced a function report that Willis completed providing that Willis fed his dogs (Tr. 259), was able to dust, put dishes away, and engage in "easy household repairs" for up to one hour (Tr. 260), that he can grocery shop for 30-60 minutes a week (Tr. 261), and that he can walk 20-30 minutes (Tr. 263). The ALJ also noted that Plaintiff indicated on that function report that his attention was "ok." (Tr. 19, 263.) The foregoing is substantial evidence supporting the ALJ's decision to discredit Plaintiff's testimony that he could stand for a total of only a few minutes during the workday and lacked concentration for unskilled work. And to the extent that Plaintiff merely testified that he could stand for a few minutes *at a time* (but could resume standing after a rest), Plaintiff has not explained how this testimony is necessarily inconsistent with the sedentary-work requirement of standing two hours *total* in an eight-hour workday. *See* S.S.R. 06-6p, 1996 WL 374185, at *6 (providing general two-hour total requirement for sedentary work).

As for Plaintiff's statement that he could sit for only two hours before needing to recline, the ALJ noted that Dr. Keeling (twice) found that Plaintiff could sit for six hours in an eight-hour workday (Tr. 22), and assigned Keeling's opinion "significant weight" (Tr. 24). Dr. Forsythe, the state-agency physician, also found that Plaintiff could sit for six hours in an eight-hour day (Tr. 658), and the ALJ also assigned his opinion significant weight (Tr. 24). It is true that the Wagner-

numbers of jobs (roughly 4,000 in the region and 100,000 in the nation) would clearly be sufficient to qualify as 'significant' under the Act)"; *Putman v. Astrue*, No. 4:07-CV-63, 2009 WL 838155, at *3 (E.D. Tenn. Mar. 30, 2009) ("The Court recognizes that 200–250 positions in the region and 75,000 positions in the national economy is not an overwhelming number. Other courts considering this issue, however, have found that a similar number of jobs constitutes significant work in the national economy.").

20

Call opinion provides that Plaintiff could sit for only four hours total in an eight-hour day – which, depending on how Plaintiff's testimony is interpreted, is still twice as long as Plaintiff's alleged limitation – but the ALJ assigned that opinion only "moderate" weight. (Tr. 24). And to the extent that the Wagner-Call opinion supports Plaintiff's testimony about his ability to sit, it undermines his testimony as to his ability to stand: the evaluators provided that Willis could stand for 30 to 45 minutes at a time and stand and/or walk for total of two hours in an eight hour day. (Tr. 741.)

The Court acknowledges that the ALJ's credibility analysis is far from paradigmatic. But the Court believes that reading the ALJ's narrative as a whole, it is discernable why he discounted Plaintiff's testimony, and that substantial evidence supports the ALJ's rationale. Given the considerable deference this Court must give an ALJ's credibility assessment, Plaintiff has not demonstrated that the ALJ committed reversible error in discounting his credibility.

### C.  Plaintiff Has Not Shown that the ALJ Reversibly Erred at Step Two

Willis next argues that the ALJ erred at step two of the five-step disability analysis by concluding that his diagnosed dysthymia, a type of chronic depression, was not a "severe" impairment. (Pl.'s Mot. Summ. J. at 24-26.) Plaintiff is correct that "the claimant's burden of proof at step two 'has been construed as a de minimis hurdle in the disability determination process . . . . [A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 774 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). Nonetheless, the Court finds that Plaintiff has not shown that the ALJ reversibly erred at step two.

In some cases, evidence outside the disability period will be of limited probative value in

view of more time-relevant records.  *See Jones v. Astrue*, No. 06-370-GWU, 2008 WL 449633, at

*5 (E.D. Ky. Feb. 15, 2008) ("[The fibromyalgia] diagnosis was made almost two years before the

plaintiff's alleged disability onset of May 28, 2003 and, so, does not strongly support her claim for

disabled status during the relevant time frame."); *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (table)

(6th Cir. 1999) ("Evidence relating to a time outside the insured period is only minimally

probable . . . but may be considered to the extent it illuminates a claimant's health before the

expiration of his insured status" (citing *Siterlet v. Secretary of Health & Human Servs.*, 823 F.2d

918, 920 (6th Cir. 1987); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988))).  This is such a case.

Aside from citing Global Assessment Functioning ("GAF") scores from 2007, Plaintiff's argument

that the ALJ erred at step two is based on medical records from prior to the alleged onset date of

March 9, 2007.  For instance, Plaintiff cites diagnoses of dysthymia and major depressive disorder

from July 2004 and February 2006.  (Pl.'s Mot. Summ. J. at 25-26 (citing Tr. 349, 391, 457).)

Plaintiff also cites  GAF scores from 2004, 2005, and February 2006.  (*Id.* (citing Tr. 391, 652-54).)

But Plaintiff himself acknowledges that on March 14, 2006, New Beginnings, the counseling facility

then treating Plaintiff, provided,

> In response to his therapeutic and medication treatment, Rickey
> Willis was able to assimilate his psychological distress into life
> experience and adaption.  Mr. Willis, therefore, was evaluated as
> attaining fitness for duty and is recommended to return to his regular
> work shift on [March 14, 2006].

(Tr. 389; *see also* Pl.'s Mot. Summ. J. at 26.)  The Court is therefore not persuaded that the medical

evidence Plaintiff cites from well before the alleged onset date establishes that the ALJ's step two

finding lacks substantial evidence.

Nor has Plaintiff shown that more time-relevant mental-health records warrant a different

result.  Plaintiff asserts that "New Beginnings Counseling diagnosed Plaintiff with mood disorder caused by medical (back pain) and dysthymic disorder with a GAF score of 40-50 throughout 2007." (Pl.'s Mot. Summ. J. at 25 (citing Tr. 347-48).)  Although GAF scores in the 40-50 range indicate "serious symptoms" or even "some impairment in reality testing or communication," American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders*, 30-34 (4th ed., Text Revision 2000), the Sixth Circuit has provided that GAF play a limited role in the disability analysis:

> We have previously held that the failure to reference a Global Assessment Functioning score is not, standing alone, sufficient ground to reverse a disability determination.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (While a Global Assessment Functioning score may be of "considerable help," it is not "essential" to determining an individual's residual functional capacity.); *see also Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 2006 WL 305648, at *13-*14 (6th Cir. Feb. 9, 2006) ("[A]ccording to the [Diagnostic and Statistical Manual's] explanation of the [Global Assessment Functioning] scale, a score may have little or no bearing on the subject's social and occupational functioning . . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [Global Assessment Functioning] score in the first place.").
>
> Moreover, the Commissioner "has declined to endorse the [Global Assessment Functioning] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [Global Assessment Functioning] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  *Wind v. Barnhart*, No. 04-16371, 2005 WL 1317040, at *6 n. 5, 133 Fed. Appx. 684 (11th Cir. June 2, 2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). Accordingly, we have affirmed denials of disability benefits where applicants had Global Assessment Functioning scores of 50 or lower. *See, e.g., Smith v. Comm'r of Soc. Sec.*, No. 02-1653, 2003 WL 22025046, 74 Fed. Appx. 548 (6th Cir. Aug. 27, 2003) (Global Assessment Functioning score of 48); *Nierzwick v. Comm'r of Soc. Sec.*, 7 Fed. Appx. 358 (6th Cir. 2001) (Global Assessment Functioning score of 35); *Thurman v. Apfel*, 211 F.3d 1270 (6th Cir. 2000) (Global Assessment Functioning score of 50).

*DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006).  Moreover, Plaintiff's 2007 GAF scores must considered alongside other record evidence.  On a function report completed in March 2008, Plaintiff himself provided that his ability to maintain attention, complete tasks, follow written and spoken instructions, get along with authority figures, and handle stress were adequate.  (Tr. 263-64.)  The ALJ also relied on Dr. Ron Marshall's March 2008 assessment that Plaintiff's mental impairments were not severe.  (Tr. 18 (citing Tr. 636).)

In short, the medical evidence Willis cites does not establish an absence of substantial evidence supporting the ALJ's finding that Plaintiff's dysthymia is not a "severe" impairment.  And even if the Court were to find otherwise, Plaintiff has not shown that the ALJ's RFC assessment limiting Plaintiff to unskilled work fails to fully account for his mental impairments.  *See Swartz v. Barnhart*, 188 F. App'x 361, 368 (6th Cir.2006) ("Even assuming that the ALJ erred by not including 'Borderline Intellectual Functioning' and 'Dependent Personality Disorder' as additional severe impairments in step two of its analysis, the error is harmless as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's impairments in determining her residual functional capacity.").  Plaintiff has therefore not established that the ALJ reversibly erred at step two.

### D.   Plaintiff Has Not Shown That the ALJ's Failure to Consider a Workers' Compensation Settlement Constituted Harmful Error

Lastly, Willis asserts that the ALJ failed to consider "evidence" as defined in 20 C.F.R. § 1512(b) by "fail[ing] to inquire [about] or address" his workers' compensation settlement.  (Pl.'s Mot. Summ. J. at 27.)  The Commissioner, relying on 20 C.F.R. § 404.1504, responds that, because decisions by other agencies are based on their rules and not on social security disability standards, such decisions are not binding on an ALJ.  (Def.'s Mot. Summ. J. at 16 (quoting 20 C.F.R. §

24

404.1504).)  But this argument misses the mark: Plaintiff does not argue that the ALJ was bound by the decision of another agency.  He simply says that the ALJ should have considered such a decision.  Indeed, S.S.R. 06-03p provides:

> we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies (20 CFR 404.1512(b)(5) and 416.912(b)(5)).  Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.

2006 WL 2329939, at *6.  The Ruling further provides that "Workers' Compensation" is an example of a determination made by another "agency" as that term is used in 20 C.F.R. § 404.1504.  *Id.*

Nevertheless, the Court finds that if the ALJ erred by failing to "inquire [about] or address" Plaintiff's workers' compensation settlement, Plaintiff has not established that the error was harmful. Willis directs the Court's attention to a "Redemption Order" signed by a magistrate judge for the Michigan Department of Energy, Labor & Economic Growth Workers' Compensation Agency/Board of Magistrates.  (Tr. 327.)  The order includes no findings.  It provides no information as to what disability standards were applied or even that the settlement was entered into because of a finding of disability.  As explained by another court in considering an analogous situation:

> [T]he reasons for the award of [worker's compensation benefits, disability benefits and disability pension benefits] are not known. The inability of General Motors to place McCormick within her restrictions does not necessarily mean that she could no longer perform her former jobs.   Worker's compensation plans and corporate disability benefit programs must take into consideration factors agreed upon in union contracts and set forth in state legislation, such as the availability of a job within a certain locale. It is possible that the jobs into which she could be placed were either filled or, as with her clerical position, were otherwise unavailable.

25

*McCormick v. Shalala*, 872 F. Supp. 392, 399 (E.D. Mich. 1994); *see also Wright v. Astrue*, No. 5:09-CV-546-FL, 2010 WL 5056020, at *4 (Sept. 16, 2010), *report and recommendation adopted by* 2010 WL 5055899 (E.D.N.C. Dec. 6, 2010) ("While acknowledging the settlement agreement, Defendant correctly points out that the agreement provides no evaluation of Claimant's ability to work and contains no medical opinion. . . .  As there is no documentation in the record providing the basis for any compensation Claimant received, there was nothing for the ALJ to consider."). Even now, Plaintiff does not provide the Court with details behind the settlement that might be relevant to a determination of disability under the Social Security Act.  (*See* Pl.'s Mot. Summ. J. at 26-27.)  Accordingly, the Court finds that the ALJ did not commit reversible error in failing to address or further inquire into Plaintiff's workers' compensation settlement.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 14) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this

26

Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise  response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  October 29, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 29, 2012.

s/Jane Johnson
Deputy Clerk